UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JULIE ANN BRAZEAU,

    **Plaintiff,**

v.                                  2:12cv307

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration,

    **Defendant.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Julie Ann Brazeau seeks judicial review of the decision of the Commissioner of

the Social Security Administration ("Commissioner") denying her claim for disability insurance

benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI of the

Social Security Act. This action was referred to the undersigned United States Magistrate Judge

pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B). Because the ALJ properly evaluated the

evidence bearing on Brazeau's residual functional capacity ("RFC"), this report recommends that

the Court affirm the final decision of the Commissioner.

## I. PROCEDURAL BACKGROUND

On May 3, 2010, Brazeau filed an application for DIB and SSI, alleging disability

beginning December 25, 2006, due to a brain aneurysm, high blood pressure, enlarged heart,

depression, and erratic heart valve. (R. 61, 72). The Commissioner denied her application

initially (R. 61-82), and upon reconsideration. (R. 122-35). Brazeau requested an administrative

hearing (R. 136-38), which was conducted on September 15, 2011. (R. 32). Administrative Law Judge ("ALJ") Irving A. Pianin noted in his opinion that Brazeau previously filed both DIB and SSI applications on May 1, 2007, which were denied initially on October 17, 2007, and which she never appealed. (R. 18). The ALJ therefore only considered Brazeau's disability from October 18, 2007. Id. He also noted that for DIB purposes Brazeau was last insured on December 31, 2009.[1] Id.

The ALJ concluded that Brazeau was not disabled within the meaning of the Social Security Act, and denied her claims for DIB and SSI. (R. 18-28). The Appeals Council denied review of the ALJ's decision (R. 1-3), thereby making the ALJ's decision the final decision of the Commissioner.

Pursuant to 42 U.S.C. § 405(g), on June 15, 2012, Brazeau filed this action seeking judicial review of the Commissioner's final decision. (See ECF No. 2). This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II. FACTUAL BACKGROUND

Brazeau was born on May 18, 1971 (R. 161), and completed the seventh grade. (R. 37). She testified that she is 4'11" and weighs 129 pounds. Id. She was previously employed as an office manager of an auto shop and as an owner of a mechanic shop. (R. 198). In December 2006, Brazeau suffered a ruptured brain aneurysm which required surgery. (R. 271-73, 324-25). Since her surgery she has only worked for two and a half days as a cashier at a BP gas station. She worked there two days in 2008 and left voluntarily, because she "panicked and kept messing

---

[1] Brazeau has not challenged the ALJ's findings as to the alleged onset date, or date last insured. See (R. 35); Pl.'s Summ. J. Mot. (presenting no objection to either of these findings).

them up." (R. 38). Brazeau alleges that she suffers from the following impairments: brain aneurysm; high blood pressure; enlarged heart; depression; and erratic heart valve. (R. 61, 72). She testified that she is unable to work because these impairments cause her to suffer depression and anxiety (R. 39, 47), fatigue id., dizziness (R. 41, 45, 50-51), and poor concentration. (R. 48-50).

The circumstances of Brazeau's aneurysm are serious and not disputed. On December 25, 2006, she arrived at DePaul Medical Center by stretcher via an ambulance. (R. 419). Prior to EMS arrival Brazeau had complained of a headache and altered mental state. (R. 420). A CT scan revealed a brain aneurysm with a massive intercranial hemorrhage. (R. 428). She was immediately transferred to Norfolk General Hospital for further treatment. (R. 429). At Norfolk General Hospital Brazeau underwent a ventriculostomy in order to drain the cerebral ventricle. (R. 324). There were no complications with this operation. (R. 325).

The next day Brazeau underwent a radiological endovascular procedure consisting of a series of arteriograms and a coil embolization to occlude the aneurysm. (R. 271-73). The procedure was successful and as of January 4, 2007, Brazeau's brain appeared normal. (R. 251-52). A week later Dr. John C. Agola noted that a CT of Brazeau's brain was unremarkable and there were no detrimental changes from the January 4 exam. (R. 250). A later magnetic resonance angiography ("MRA") in March 2007 revealed "[n]o residual or recurrent aneurysm." (R. 258).

Following the initial procedures in December 2006, Brazeau was hospitalized until January 20, 2007 and had regular check-ups at Norfolk General Hospital (See R. 274-336). Two weeks after the procedure Dr. Maria Deguzman examined Brazeau and found that her cranial

nerves were intact and that she was alert and oriented as to herself, city, and date. (R. 335). Dr. Deguzman also noted that Brazeau had a history of cocaine and methamphetamine abuse. (R. 333). She noted that Brazeau had short-term memory deficits, mild to moderate logic difficulties, and mild to moderate cognitive deficits. Id. Dr. Deguzman recommended Brazeau participate in physical, occupational, and speech therapy for her then-existing impairments. (R. 335). Discharge notes from January 20 documented that Brazeau was alert but mildly disoriented and cited that her polysubstance abuse may have contributed to the ruptured aneurysm. (R. 470). The discharge form also notes that she had full use of her extremities with normal sensation and that her blood pressure was well-controlled on her current medications. Id. At a follow-up visit six months later Brazeau's brain appeared normal for post-aneurysm coiling. (R. 276). During a September 2007 visit Dr. Anthony Russo found no acute intercranial abnormality and noted that Brazeau's lungs were clear with no active pulmonary disease. (R. 282-84).

On October 4, 2007, after Brazeau's first disability claim, Dr. Jerry F. Foer, a clinical neuropsychologist, examined Brazeau concerning her short-term memory loss problems, fatigue and balance issues, and depression and anxiety. (R. 338). Brazeau reported a history of crack cocaine, crystal methamphetamine, powder cocaine, and cigarette use. (R. 339).

Dr. Foer observed that Brazeau had slurred and rapid speech and spoke with a child-like tone. (R. 341). He determined that she could comprehend instructions, that her attention and concentration was satisfactory, and that her thought processes were logical and goal directed. Id. He noted that she had a deficient fund of information but that her awareness of recent news and fund of personal data was adequate. Id. Dr. Foer found that while Brazeau's intelligence was average to low average, her visual attention involving motor responses and common-sense

4

reasoning were intact, her verbal fluency in category recall was normal, and she could either repeat or write a sentence on command. (R. 341-42). He noted that she was limited in her ability to interpret select proverbs and had balance difficulty with heal-toe walking. Id. However, he found that Brazeau was able to follow a complex (3-step) command. (R. 342).

Dr. Foer also tested Brazeau's memory. He found that Brazeau's immediate memory was average, ranking in the 50th percentile. (R. 342). Her immediate auditory and visual memories were average as well, ranking in the 30th and 73rd percentile respectively. Id. Brazeau's general memory was also average and ranked in the 70th percentile. Id. Her general auditory memory was average in the 50th percentile, her general visual memory was high average in the 84th percentile, and her auditory recognition was average in the 50th percentile. Id. Finally, Dr. Foer found Brazeau's working memory was average in the 27th percentile. Id.

Dr. Foer further observed that Brazeau had deficits in her fund of information, mental reversal, motor functioning, and abstract reasoning. (R. 343). He noted that Brazeau reports short-term memory problems and emotional problems since suffering her brain aneurysm. Id. Brazeau also reported depression since childhood and recent cocaine and crystal meth abuse. Id. Dr. Foer gave her a Global Assessment of Function ("GAF") of 41-50[2], but found her memory to be average. (R. 343-44).

Dr. Foer ultimately concluded that:

> Ms. Brazeau appears to have the cognitive capacity to perform simple and directed job duties. She also appears to be capable of performing some detailed and complex job tasks. She appears to be

---

[2] The GAF scale is a numeric scale (0 through 100) used for reporting the clinician's judgment of an individual's overall level of functioning at a specific point in time. It is rated with respect only to psychological, social, and occupational functioning. A GAF score in the 41-50 range indicates serious symptoms or any serious impairment in social, occupation, or school functioning. Diagnostic and Statistical Manual of Mental Disorders Text Revision pp. 32-4 (4th ed. 2000).

capable of accepting instructions from supervisors and interacting appropriately with co-workers and with the public. However, she may have difficulty dealing with the usual stresses encountered in competitive work. She appears to be capable of maintaining regular attendance in the work place, although her physical problems (e.g., fatigue, weakness) may interfere with her ability to perform some work activities on a consistent basis. She does not appear to require special or additional supervision. Ms. Brazeau appears to be capable of managing her own funds.

(R. 343).

In January 2008, Brazeau visited Dr. Agola for a follow-up from a December MRA. (R. 468). Dr. Agola noted that Brazeau was neurologically intact and stable with no complaints. Id. He recommended a follow-up visit in six months to assess any regrowth of the aneurysm. Id. After follow-up visits revealed aneurysm regrowth (R. 257, 260-62, 265-66), Brazeau underwent a successful first stage "Y" stent reconstruction in September 2008 in preparation for a follow up coil embolization of the aneurysm remnant. (R. 260-61). In November 2008 she had a successful second stage "Y" stent reconstruction as well as a coil embolization on the aneurysm remnant which Dr. Agola described as "uneventful." (R. 267-69).

From April 2008 to February 2010 Brazeau treated with Dr. Russo. (R. 464). In April 2008 Brazeau complained of blood pressure problems and a missed period. Id. She conveyed that she suffered fatigue and dizziness but reported no chest pain or headaches. Id. Dr. Russo found Brazeau positive for fatigue, nausea, and dizziness, but negative for weakness, headaches, and blurry vision. (R. 464-65). He diagnosed her with absence of menstruation, fatigue, and hypotension. (R. 465). Brazeau next visited Dr. Russo in December 2008 for a refill of Coreg and Zocor. (R. 462). Dr. Russo noted that she was alert and oriented, not lethargic, and had no cranial deficit. (R. 463). Brazeau last visited Dr. Russo in February 2010 due to lipids and blood

pressure. (R. 459). Dr. Russo assessed her for hypertension and lipidemia. Id. He continued her on her current medications for hypertension after noting her blood pressure was 120/80 and started her on Simvastatin for the lipidemia. Id. Dr. Russo also noted that Brazeau was negative for fatigue and weakness and exhibited no neurological issues. (R. 460). He found her "[m]ood, memory, affect and judgment normal." (R. 461).

From December 2008 to November 2009 Brazeau made three trips to the emergency room. In December 2008 Brazeau visited the emergency room at Norfolk General Hospital and was diagnosed with syncope and cocaine abuse. (R. 312). She was given information on chemical dependency and cocaine abuse. (R. 312-15). In 2009 Brazeau twice visited the emergency room at DePaul Medical Center for non-neurological and non-psychiatric issues. (R. 403-418). On both occasions she arrived via private auto and appeared alert and oriented. (R. 403-04, 412-13). During her first visit in April 2009, Brazeau denied any neurologic symptoms or deficits. (R. 413). At her November 2009 visit her cranial nerves were intact, her reflexes were 2/4, strength 5/5, and her sensation was intact. (R. 404).

Brazeau began seeing Dr. James Paschal as her primary care physician in 2010. (R. 487). In November 2010 Dr. Paschal cited Brazeau's active problems as: hypertension; hypercholesterolemia; congestive heart failure ("CHF"); cerebral aneurysm with a stent placed; cerebrovascular accident ("CVA"); short-term memory loss; and chronic insomnia. Id. He noted that Brazeau's CVA was:

> associated with cerebral aneurysm and manifested by short-term memory loss, difficulty in multitasking, occasional vertigo, changes in taste and anxiety/panic attacks, disabled and unable to perform simple tasks without making significant errors, unable to maintain employment as a cashier at a gas station, as a painter painting homes or as a babysitter.

Id. He listed Brazeau's medications as Plavix, ASA, Coreg, Zocor, Lisinopril, and Elavil. Id.

Dr. Paschal assessed that Brazeau's "[c]hronic medical problems appear to be under good control with the present medical regimen." (R. 488). He recommended she take Elavil at bedtime for her insomnia as well as for her "underlying tendency toward depression." Id.

Brazeau next visted Dr. Paschal in February 2011 and informed him that she was sleeping well after taking the Elavil but complained of a recent upper respiratory infection. (R. 485). Dr. Paschal noted that Brazeau was pursuing disability and stated that "[s]he may need to undergo neurological and psychological evaluation to further define her disabilities." Id. He again concluded that her current regimen appropriately addressed her medical problems. (R. 486). He recommended she continue her present medical regimen and start dietary restrictions and regular exercise to aid in weight loss. Id. Dr. Paschal cited the same findings and recommendations at a follow-up visit in August 2011. (R. 483-84).

On September 13, 2011, Dr. Paschal conducted a Physical Residual Functional Capacity Evaluation for Brazeau. (R. 493-97). Dr. Pashcal listed Brazeau's impairments as hypertension, hypercholesterolemia, CHF, CVA, short-term memory loss, depression, anxiety, and panic attacks, and her symptoms as short-term memory loss and disequilibrium. (R. 493). He cited that Brazeau had no pain and no emotional factors which contributed to her symptoms and functional limitations. (R. 493-94). He did note, however, that she suffered psychological conditions including depression, anxiety, and insomnia, which do affect her functional capabilities. (R. 494). He also found that Brazeau's impairments had lasted or could be expected to last at least twelve months. (R. 493).

Dr. Paschal also opined that Brazeau had physical limitations such that she could only sit

for fifteen minutes before needing to stand, stand for thirty minutes before needing to sit, and could only walk one block before needing to rest. Id. He determined that Brazeau could sit less than two hours and stand at least six hours in an eight-hour workday; had to walk for at least four minutes every fifteen minutes; needed to shift positions at will during work; and would need to take unscheduled breaks every hour for roughly fifteen minutes. (R. 495). He further found she was capable of carrying no more than ten pounds occasionally and twenty pounds rarely; with no climbing ladders, and rare crouching and looking up, but allowing for other postural activities occasionally or frequently. (R. 495-96).

Dr. Paschal ultimately concluded that Brazeau could not work due to her memory problem, poor concentration, and balance problems when looking up or down. (R. 496). He found that these impairments would produce "good days" and "bad days" and would result in Brazeau being absent from work more than four days per month. Id. Dr. Paschal further found that Brazeau's memory loss would frequently interfere with the attention and concentration needed to perform even simple work tasks. (R. 494). He thus opined that Brazeau was incapable of performing even "low stress" jobs. Id. He based this opinion on Brazeau's self-report of frequent errors as a store clerk at BP in 2008. Id.

At the hearing, Brazeau testified that she is disabled and unable to work because of fatigue, depression, panic attacks, and poor public relations. (R. 39). She also stated that she has difficulty concentrating (see R. 49-50), and balance issues which sometimes cause her to walk sideways. (R. 45, 51). She testified that she takes Elavil for her depression and anxiety. (R. 40). She testified that she has not received any mental health treatment, because she cannot afford it (R. 39-40), nor has she had any psychiatric hospitalizations. (R. 45). Brazeau further testified

that she stopped using crack cocaine 16 months before the hearing, before which she was using cocaine two or three times a week. (R. 43). She stated that she functioned the same whether or not she was intoxicated. (R. 44).

Brazeau lives with her sister. (R. 36). She does little driving (R. 42) and cooking, does her own laundry, and grocery shops with her sister. (R. 47). She has a daughter and three grandchildren, but stated she is not allowed to babysit her grandchildren, because she tried it once and it did not go well. (R. 46-47). She indicated that for the most part, she gets along with people "okay." (R. 46).

Brazeau's sister, Deborah Speed, also testified at the hearing. (R. 52-57). Speed testified that Brazeau has difficulty focusing (R. 53), is easily distracted (R. 54), repeats herself in conversation (R. 54), and acts very child-like. (R. 55, 56). She stated that she no longer allows Brazeau to vacuum, because on one occasion Brazeau concentrated on only one area of the carpet until the carpet burned. (R. 55). Speed further testified that Brazeau sometimes struggles with her balance. (R. 55-56). She stated that since her ruptured aneurysm, Brazeau is no longer independent, and Speed is not comfortable leaving her alone. (R. 56-57). Speed testified, however, that Brazeau does drive short distances and attends a weekly Bingo game with her mother-in-law. (R. 54-55).

In addition to Brazeau's and Speed's testimony, the ALJ heard from Linda Auggins, a vocational expert ("VE"). The VE testified based upon limitations framed by the ALJ that Brazeau could work as a dining room attendant or garment folder. (R. 58). She testified that there were approximately 1,500 positions locally and 430,000 available nationally for the occupation of dining room attendant, and 2,100 positions locally and 919,000 available nationally for

garment folder. Id. The VE also stated that no work would be available if Brazeau was not able to handle regular work stresses such as being on time and working a full eight hours. Id. She further testified that neither the dining room attendant, nor the garment folder, occupation allows for unscheduled breaks. (R. 59). She also noted that a GAF score between 41 and 50 is "considered a serious symptom, which would preclude work." Id.

## III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decisions falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and

must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act. To be eligible for SSI payments under Title XVI of the Act, the claimant, in addition to satisfying the income and resource requirements in 42 U.S.C. §§ 1382a and 1382b, must also satisfy the basic eligibility and definitional requirements found in 42 U.S.C. §§ 1382(a) and 1382c.

The Social Security Regulations define "disability" as the:

> inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is

12

disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hays v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

**A. The ALJ's Decision**

In this case, the ALJ made the following findings under the five part analysis: (1) the ALJ found that Brazeau had not engaged in substantial gainful employment since October 18, 2007 (the alleged onset date); (2) Brazeau had severe impairments of status post brain hemorrhage due to a ruptured aneurysm, mood disorder, and anxiety disorder; (3) her combination of impairments did not meet one of the listed impairments in Appendix 1; and (4) Brazeau had the RFC to perform light work involving occasional postural activity, with specified restrictions that she avoid climbing and exposure to heights and hazards. Additionally, the ALJ found that due to moderate limitations in social functioning and in concentration, persistence, and pace, Brazeau was limited to simple, routine and repetitive one or two-step tasks with no more than occasional contact with co-workers, supervisors, and the public. Finally, although the ALJ concluded that Brazeau could not perform her past relevant work, he did identify jobs which exist in substantial numbers in the national economy which Brazeau could perform. (R. 20-27).

Brazeau's motion for summary judgment contends that the ALJ improperly evaluated the evidence in determining Brazeau's RFC. (See ECF No. 10 at 11-20). Specifically, she argues that the ALJ did not properly evaluate and weigh the opinions of a consultative examiner and treating physician, and that the ALJ erred by improperly rejecting the testimony of a lay witness. Id. Each of these arguments is addressed in turn.

**B. The ALJ Properly Evaluated the Evidence Bearing on Brazeau's RFC**

Brazeau contends that the ALJ erred in determining her RFC, which is defined as the plaintiff's maximum ability to work despite her impairments. 20 C.F.R § 404.1545(a)(1); see SSR 96-9P, 1996 WL 374185, at *2 (S.S.A. July 2, 1996) ("RFC is the individual's maximum

remaining ability to perform sustained work on a regular and continuing basis."). When a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must then determine the plaintiff's RFC. 20 C.F.R. § 404.1520(e). After doing so, the ALJ uses that RFC at step four of the sequential analysis to determine whether the plaintiff can perform his past relevant work. Id. § 404.1545(a)(5)(i). If the plaintiff cannot perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy. Id. § 404.1545(a)(5)(iii).

At the administrative hearing level, the ALJ alone has the responsibility of determining RFC. Id. § 1546(c). RFC is determined by considering all the relevant medical and other evidence[3] in the record. Id. §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements'-i.e., opinions about what the individual can still do despite his or her impairment(s)-submitted by an individual's treating source or other acceptable medical sources." SSR 96-8P, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). In this case, the ALJ found that Brazeau had the RFC to perform a modified range of light work with certain restrictions. In doing so, he properly analyzed the evidence before him, including the medical evidence from Dr. Foer and Dr. Paschal, and the other evidence of the alleged disability.

### 1. The ALJ properly explained the weight assigned to medical opinions

Brazeau contends that the ALJ did not properly evaluate the medical evidence and erred

---

[3] "Other evidence" includes statements or reports from the claimant, the claimant's treating and nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

by giving improper weight to the opinions of Drs. Foer and Paschal. (ECF No. 15 at 15, 17). She specifically asserts that the ALJ failed to properly consider the GAF score of 41-50 assessed by Dr. Foer and improperly rejected the opinion of Dr. Paschal by according his opinion only "minimal weight." (R. 14-18).

As stated previously, the ALJ alone has the responsibility of determining RFC. In doing so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship"; (2) "[n]ature and extent of treatment relationship"; (3) degree of "supporting explanations for their opinions"; (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. §§ 404.1527(c) and 416.927(c).

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. §§ 404.1527(d)(1)-(2) and 416.927(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Id. §§ 404.1527(d)(2) and 416.927(d)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]."

16

SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996). When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. Id. §§ 404.1527(c)(2) and 416.927(c)(2). When the evidence is such that reasonable minds could differ as to whether a claimant is disabled, the ALJ, and ultimately the Commissioner, must resolve any inconsistencies in the evidence. Johnson v. Barnhart 434 F.3d 650, 653 (4th Cir. 2005).

In his decision, the ALJ found, after "careful consideration of the entire record," that Brazeau was capable of performing light work, as defined by 20 C.F.R. § 404.1567(b) and 20 C.F.R. § 416.967(b), which required "only simple routine repetitive one and two-step tasks." (R. 23). In making the RFC determination, the ALJ provided a detailed review of Brazeau's treatment record including the records of Drs. Foer and Paschal. (R. 24-26).

### a. Dr. Foer

The ALJ gave great weight to Dr. Foer's October 4, 2007 opinion. (R. 25). Dr. Foer found that while Brazeau had some cognitive and psychological deficits, she was capable of performing simple and directed job duties with some ability to perform detailed and complex job tasks. (R. 343). While Dr. Foer also noted that Brazeau may have difficulty with the usual stresses in a competitive work environment, he found that she was capable of accepting instructions, appropriately interacting with co-workers and the public, and did not require special or additional supervision. Id. He further concluded that she was capable of maintaining regular work attendance. Id.

The ALJ emphasized that while Dr. Foer found some mental deficits and gave Brazeau a GAF score of 41-50, he concluded:

> Ms. Brazeau appears to have the cognitive capacity to perform simple and direct job duties. She also appears to be capable of performing some detailed and complex job tasks. She appears to be capable of accepting instructions from supervisors and interacting appropriately with co-workers and with the public. However, she may have difficulty dealing with the usual stresses encountered in competitive work. She appears to be capable of maintaining regular attendance in the work place, although her physical problems (e.g., fatigue, weakness) may interfere with her ability to perform some work activities on a consistent basis. She does not appear to require special or additional supervision. Ms. Brazeau appears to be capable of managing her own funds.

(R. 25). The ALJ also noted that the record as a whole did not support a finding of serious symptoms or significant functional loss based on mental health impairments. (R. 25). He thus gave great weight to Dr. Foer's opinion concerning Brazeau's "ability to sustain work activity, interact effectively in a work setting, and perform without special instruction." (R. 25-26). The ALJ further concluded that the RFC limitation to simple work could accommodate the mental deficits found by Dr. Foer "as simple routine tasks require little independent decision-making and are inherently less stressful." (R. 26).

The ALJ properly explained his decision to accord great weight to Dr. Foer's opinion. Dr. Foer is a neuropsychologist who conducted a consultative examine, which included a clinical interview, mental state exam, and memory testing. (R. 341-44). The ALJ appropriately noted that Dr. Foer's exam was the only clinical observation of mental deficits in the record. (R. 24). Moreover, Dr. Foer's opinion is not inconsistent with other medical evidence in the record. With the exception of Dr. Paschal's opinion, which is addressed below, none of Brazeau's providers indicated her status-post aneurysm surgery should have produced work disabling symptoms. Two weeks after surgery in December 2006, Dr. Deguzman found that Brazeau suffered only mild to moderate logic difficulties and cognitive deficits. (R. 333). In 2009, Brazeau appeared alert and oriented during her visits to DePaul Medical Center, and at her April 2009 visit she

18

denied any neurologic symptoms or deficits. (R. 403-04, 412-13). In February 2010, Dr. Russo noted that Brazeau exhibited no neurological issues and found her "[m]ood, memory, affect and judgment normal." (R. 460-61).

Notwithstanding the fact that the ALJ gave great weight to Dr. Foer's opinion and detailed observations of her cognitive disabilities, Brazeau asserts that the ALJ failed to accord appropriate weight to Dr. Foer's opinion. (ECF No. 10 at 15). She primarily argues that the ALJ did not properly consider Dr. Foer's assessment of a GAF score of 41-50 or give adequate reasons for rejecting the score. Id. at 15-16. She links her argument to the VE's testimony, in response to her attorney's question, that an individual with a GAF score of 41-50 would be precluded from work. Id. at 15.

A GAF score, however, does not have significant weight relative to a claimant's overall medical record. "A GAF score may reflect the severity of a patient's functioning or her impairment in functioning at the time the GAF score is given. Without additional context a GAF score is not meaningful." Love v. Astrue, 3:11CV14-FDW-DSC, 2011 WL 4899989, at *4 (W.D.N.C. Sept. 6, 2011) (citing Green v. Astrue, C/A No. 1: 10–1840–SVH, 2011 WL 1770262, at *18 (D.S.C. May 9, 2011) (emphasis added)). While a GAF score provides evidence of an impairment, "it alone is not determinative of social security disability." Brown v. Astrue, No. 7:08CV003, 2008 WL 5455719, at *5 n.6 (W.D. Va. Dec. 31, 2008) (citations omitted); see also Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50746 (2000).

Moreover, a low GAF score does not necessarily suggest that the claimant is precluded from work. GAF scores reflect either serious symptoms or impairments in functional abilities.

Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed., Text Revision 2000). "A GAF score is intended to be used in treatment decisions and may have little to no bearing on a plaintiff's occupational functioning." Love v. Astrue, 2011 WL 4899989 at *4 (citing Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 511 (6th Cir. 2006)). "A GAF score, standing alone, is not evidence of an impairment that seriously interferes with Plaintiff's ability to work." Id. (citing Lopez v. Barnhart, 78 F. App'x 675, 678 (10th Cir. 2003)). This guidance is particularly relevant here as Dr. Foer assessed a GAF score of 41-50, yet nonetheless determined based upon his clinical observations that Brazeau was capable of performing simple and directed work.

Moreover, the ALJ's opinion directly addressed and considered Brazeau's GAF score. (R. 25). However, he ultimately found Dr. Foer's clinical observations and conclusion more persuasive and more consistent with the other medical evidence in the record than the lone GAF score. Id. While Dr. Foer gave Brazeau the low GAF score, he also found that her memory was average or above average in all categories, that she could comprehend instructions, that her attention and concentration were satisfactory, and that she was able to follow a complex command. Additionally, as noted above, there are no clinical observations of mental deficits by neurologists, psychologists, or mental health providers other than Dr. Foer, who explicitly concluded Brazeau was capable of low stress work. The ALJ considered Brazeau's GAF score and all the relevant factors, including his observations of her mental condition, when analyzing Dr. Foer's opinion, and supported his conclusion with substantial evidence. He did not err in giving Dr. Foer's clinical observations and opinion more weight.

### b. Dr. Paschal

Brazeau next contends that the ALJ improperly rejected Dr. Paschal's opinion. The ALJ accorded minimal weight to Dr. Paschal's September 13, 2011 RFC evaluation in which he opined that due to short-term memory loss, poor concentration, and disequilibrium, Brazeau is incapable of performing even low stress jobs. (R. 26). In so doing, the ALJ noted that Dr. Paschal was Brazeau's primary care physician and the only treating source to reference depression. Id. He further noted that at Brazeau's most recent appointment with Dr. Paschal, "he changed no medications, noted the absence of side effects, and concluded that [Brazeau's] chronic medical problems 'appear to be under good control.'" Id. The ALJ thus concluded that Dr. Paschal's opinion that Brazeau's limitations precluded work of any kind was not supported by the record as a whole or by Dr. Paschal's own records. Id.

In her motion for summary judgment, Brazeau asks the Court to overturn the decision of the ALJ and assign more weight to Dr. Paschal's September 2011 assessment, which is more favorable to her claims for DIB and SSI. Having reviewed the ALJ's decision and the aforementioned reasons articulated in that decision, the undersigned finds that the ALJ supplied "good reasons" for not giving "controlling weight" to Dr. Paschal's September 2011 RFC evaluation.

The ALJ acknowledged that Dr. Paschal was Brazeau's primary care physician, and thus a treating physician, yet the ALJ found that Dr. Paschal's own records did not support the extreme limitations he found. The ALJ's finding is supported by substantial evidence as Dr. Paschal's medical records do not support severe limitations on her ability to work. Dr. Paschal cited that Brazeau suffered from several active problems including CVA, short-term memory

loss, and chronic insomnia as well as having an underlying tendency toward depression. (R. 487-88). Yet, Dr. Paschal cited no clinical or diagnostic testing as a basis for these diagnoses. Rather, they appear based on prior diagnoses by other physicians and Brazeau's self-report. Dr. Paschal also noted during a February 2011 appointment that Brazeau "may need to undergo neurological and psychological evaluation to further define her disabilities." (R. 485). There is no evidence in the record that Dr. Paschal or any other provider ever performed this evaluation. Instead, on her disability forms Brazeau wrote, "Dr. Paschal informed me I really need to be checked by a Neurologist due to my condition. I have to checked by a specialist. He is only a primary care doctor." (R. 234). Further, Dr. Paschal's notes from Brazeau's last appointment on August 16, 2011 state that her "[c]hronic medical problems appear to be under good control." (R. 484).

Additionally, the ALJ's finding that Dr. Paschal's extreme limitations are not supported by the record as a whole is supported by substantial evidence. Brazeau contends that Dr. Paschal's findings are supported in the record by the GAF score given by Dr. Foer and through Deborah Speed's testimony. While these two pieces of evidence lend support to Dr. Paschal's opinion, the ALJ explained that the record as a whole suggests that Brazeau's mental limitations are substantially less severe. For instance, Dr. Paschal's opinion is in direct conflict with Dr. Foer's clinical observations and opinion that Brazeau is capable of work. This is significant because the ALJ gave great weight to Dr. Foer's opinion. Moreover, Dr. Foer conducted clinical tests, recorded detailed observations, and is a neuropsychologist, the very specialist that Dr. Paschal suggested Brazeau see. The record also contains medical evidence from other treating physicians who found Brazeau's neurological symptoms to be only moderate or non-existent after her admittedly serious brain injury. "Where conflicting evidence allows reasonable minds

22

to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Comissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. It is not this Court's function to reweigh the evidence or to determine in this instance whether Brazeau is disabled. Instead the inquiry here examines only the question of whether the ALJ's conclusion resolving those factual conflicts is supported by substantial evidence. Here, it is. Accordingly, the ALJ did not err by refusing to give Dr. Paschal's opinion controlling weight. Jones v. Sullivan, 954 F.2d 125, 128-29 (3d Cir. 1991).

**2. The ALJ correctly evaluated Speed's testimony concerning Brazeau's symptoms**

Brazeau next argues that the ALJ erred in rejecting Speed's testimony about Brazeau's symptoms. (ECF No. 10 at 19). At step four of the analysis, the ALJ determined that though "[Brazeau's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; . . . [Brazeau's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessement." (R. 24) (emphasis omitted). The ALJ elaborated that "[i]n terms of [Brazeau's] and [Speed's] allegations of cognitive and psychological deficits, there is no treating or examining evidence to support the extent of the alleged limitations." Id. Thus, the ALJ specifically found that the treatment records do not reflect the degree of symptoms and limitations alleged by Speed.

In deciding whether a plaintiff is disabled, the ALJ must consider all symptoms, and the extent to which such symptoms can reasonably be accepted as consistent with the objective evidence. 20 C.F.R. §§ 404.1529(a) and 416.929(a). Statements about symptoms by other persons, such as siblings, are not alone sufficient to establish disability. Id. Under both federal

regulations and Fourth Circuit precedent, determining whether a person is disabled by pain or other symptoms is a two-step process. First, the plaintiff must satisfy a threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the symptoms claimed. 20 C.F.R. §§ 404.1529(b) and 416.929(b); Craig, 76 F.3d at 594-95.

After the plaintiff has satisfied the first step, the ALJ must evaluate the intensity and persistence of the plaintiff's symptoms and the extent to which they affect her ability to work. 20 C.F.R. §§ 404.1529(c)(1) and 416.929(c)(1). In making this evaluation, the ALJ must consider "all the evidence," including: (1) the plaintiff's history, including her own statements, id.; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques," id. at §§ 404.1529(c)(2) and 416.929(c)(2); and (3) other evidence submitted by the plaintiff relevant to the severity of the impairment such as evidence of daily activities, medical treatments and medications, and descriptions of the pain or other symptoms. Id. at §§ 404.1529(c)(3) and 416.929(c)(3).

Specifically as to "other evidence", the ALJ may consider evidence from non-medical sources, such as siblings, which "show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. §§ 404.1513(d)(4) and 416.913(d)(4); 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). In evaluating the intensity and persistence of the plaintiff's symptoms and the extent to which they affect her ability to work, the ALJ must consider whether inconsistencies exist in the evidence. Id. at §§ 404.1529(c)(4) and 416.929(c)(4). According to the regulations, a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted

as consistent with the objective medical evidence and other evidence." Id.

Here, the ALJ followed this two-step inquiry. He first found that Brazeau's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 24). In other words, Brazeau satisfied her threshold obligation.

Although Brazeau satisfied this threshold burden, the ALJ found that the intensity, persistence and limiting effects of these symptoms were not inconsistent with his RFC assessment. (R. 24). In so holding, the ALJ considered Speed's testimony but found that there was no treating or examining evidence to support the extent of the cognitive and psychological deficits she alleged. See SSR 06-03P at *6 ("In considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, . . . it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other facts that tend to support or refute the evidence."). In so holding, the ALJ considered the entire record and documented his review in detail in the written opinion.

The ALJ specifically noted that Dr. Foer's neuropsychiatric evaluation is the only source in the record to document any mental deficits, and yet Dr. Foer found Brazeau was capable of sustained work. (R. 24). He also cited that Dr. Russo's records establish that Brazeau's blood pressure is well controlled by medication. Id. The ALJ also considered Brazeau's claims that she needs specialized mental health treatment but is unable to afford it. Id. The ALJ noted that Brazeau has sought and received medical treatment every year since her alleged onset date, including at least three visits to the emergency room, but none of these visits or treatments were for mental health or psychiatric issues. Id. He further noted that Brazeau had not made any

attempt to obtain treatment from any local sources for the uninsured. Id. Finally, the ALJ also noted that Brazeau denied any neurologic issues during an April 2009 emergency room visit, and that her current medications are preventive and not specifically prescribed to address symptoms. (R. 25). Having reviewed the ALJ's opinion, the Court finds that the ALJ complied with both the regulations and Fourth Circuit precedent in evaluating Brazeau's symptoms and Speed's testimony, and supported his decision with substantial evidence.

To the extent Brazeau contends that the ALJ erred in evaluating Speed's credibility, the Court must give great deference to the ALJ's credibility determinations. Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997). "When factual findings rest upon credibility determinations, they should be accepted by reviewing court absent 'exceptional circumstance.'" Id. (quoting NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). The Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NLRB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993). Here, the ALJ performed the required analysis and articulated his reasons for not fully crediting Speed's testimony. There is ample objective evidence in the record to contradict Speed's testimony and support the ALJ's credibility determination. The undersigned finds no exceptional circumstance, nor error in the ALJ's findings with respect to Speed's credibility.

## V. **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Court GRANT the Commissioner's motion for summary judgment, DENY the Plaintiff's motion for summary judgment, and affirm the final decision of the Commissioner.

## VI. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller

United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
February 28, 2013

<u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

John Harlow Klein
Montagna Klein Camden LLP
425 Monticello Ave.
Norfolk, VA 23510


Virginia Lynn Van Valkenburg
United States Attorney Office
101 W Main St
Suite 8000
Norfolk, VA 23510


Fernando Galindo, Clerk


By     _____
              Deputy Clerk

_____, 2013