

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

JULIE ANN BRAZEAU,

     **Plaintiff**

v.                                 **CIVIL NO. 2:12cv307**

CAROLYN W. COLVIN,

     **Defendant.**

## OPINION AND ORDER

This matter comes before the Court upon Julie Ann Brazeau's ("Brazeau" or "Plaintiff") objections to the Report and Recommendations of the Magistrate Judge. Pl.'s Objs., ECF No. 15. For the reasons set forth herein, the Court: (1) **ACCEPTS** the Magistrate Judge's Report and Recommendations, ECF No. 14; (2) **AFFIRMS** the decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant")[1]; (3) **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 9; and (4) **GRANTS** Defendant's Motion for Summary Judgment, ECF No. 11.

## Contents

I.      **PROCEDURAL BACKGROUND**...........................................................................2

II.     **FACTUAL BACKGROUND**.................................................................................3

III.    **STANDARD OF REVIEW**.................................................................................12

---

[1] For clerical purposes, the Defendant's name has been changed from Michael J. Astrue, the former Commissioner of the Social Security Administration, to Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration.

1

IV. DISCUSSION...................................................................................................13

    A. THE ALJ CORRECTLY CONSIDERED AND REJECTED THE GAF SCORE..............13

    B. THE ALJ CORRECTLY WEIGHED DR. PASCHAL'S OPINION................................16

        1. The ALJ Correctly Applied the Legal Standard.........................................16

        2. The ALJ's Decision to Afford Dr. Paschal's Opinion Minimal Weight is Supported by Substantial Evidence............................................18

    C. THE ALJ CORRECTLY EVALUATED THE TESTIMONY OF DEBORAH SPEED.......................................................................................................................20

V. CONCLUSION.................................................................................................20

## I. PROCEDURAL BACKGROUND

On May 3, 2010, Brazeau filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability beginning December 25, 2006, due to a brain aneurysm, high blood pressure, enlarged heart, depression, and erratic heart valve. R. 61, 72. The Commissioner denied her application initially, R. 61-82, and upon reconsideration. R. 122-35. Brazeau requested an administrative hearing, R. 136-38, which was conducted on September 15, 2011. R. 32. Administrative Law Judge ("ALJ") Irving A. Pianin noted in his opinion that Brazeau previously filed both DIB and SSI applications on May 1, 2007, which were denied initially on October 17, 2007, and which she never appealed. R. 18. The ALJ therefore only considered Brazeau's disability from October 18, 2007. R. 18. He also noted that for DIB purposes Brazeau was last insured on December 31, 2009. R. 18.

2

The ALJ concluded that Brazeau was not disabled within the meaning of the Social Security Act, and denied her claims for DIB and SSI. R. 18-28. The Appeals Council denied review of the ALJ's decision, R. 1-3, thereby making the ALJ's decision the final decision of the Commissioner.

Pursuant to 42 U.S.C. § 405(g), on June 15, 2012, Brazeau filed the instant action seeking judicial review of the Commissioner's final decision. See ECF No. 2. Plaintiff filed her Motion for Summary Judgment on September 24, 2012. ECF No. 9. Defendant filed his Motion for Summary Judgment on October 22, 2012. ECF No. 11. The matter was then referred to a United States Magistrate Judge pursuant to: (1) 28 U.S.C. § 636(b)(1)(B) and (C); (2) Rule 72(b) of the Federal Rules of Civil Procedure; and (3) Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. The Magistrate Judge's Report and Recommendations, issued on February 28, 2013, recommends that Plaintiff's Motion for Summary Judgment be DENIED, Defendant's Motion for Summary Judgment be GRANTED, and the decision of the Commissioner be AFFIRMED. ECF No. 14.

Plaintiff filed her objections to the Magistrate Judge's Report and Recommendations on March 13, 2013. Pl.'s Objs., ECF No. 15.

## II.    FACTUAL BACKGROUND

Brazeau was born on May 18, 1971, R. 161, and completed the seventh grade. R. 37. She testified that she is 4'11" and weighs 129 pounds. R. 37. She was previously employed as an office manager of an auto shop and as an owner of a mechanic shop. R. 198. In December 2006, Brazeau suffered a ruptured brain aneurysm which required surgery. R. 271-73, 324-25. Since her surgery she has only worked for two and a half days as a cashier at a BP gas station. She worked there two days in 2008 and left voluntarily, because she "panicked and kept messing

3

them up." R. 38. Brazeau alleges that she suffers from the following impairments: brain aneurysm; high blood pressure; enlarged heart; depression; and erratic heart valve. R. 61, 72. She testified that she is unable to work because these impairments cause her to suffer depression and anxiety, R. 39, 47, fatigue, R. 39, 47, dizziness, R. 41, 45, 50-51, and poor concentration, R. 48-50.

The circumstances of Brazeau's aneurysm are serious and not disputed. On December 25, 2006, she arrived at DePaul Medical Center by stretcher via an ambulance. R. 419. Prior to EMS arrival Brazeau had complained of a headache and altered mental state. R. 420. A CT scan revealed a brain aneurysm with a massive intercranial hemorrhage. R. 428. She was immediately transferred to Norfolk General Hospital for further treatment. R. 429. At Norfolk General Hospital Brazeau underwent a ventriculostomy in order to drain the cerebral ventricle. R. 324. There were no complications with this operation. R. 325.

The next day Brazeau underwent a radiological endovascular procedure consisting of a series of arteriograms and a coil embolization to occlude the aneurysm. R. 271-73. The procedure was successful and as of January 4, 2007, Brazeau's brain appeared normal. R. 251-52. A week later Dr. John C. Agola noted that a CT of Brazeau's brain was unremarkable and there were no detrimental changes from the January 4 exam. R. 250. A later magnetic resonance angiography ("MRA") in March 2007 revealed "[n]o residual or recurrent aneurysm." R. 258.

Following the initial procedures in December 2006, Brazeau was hospitalized until January 20, 2007 and had regular check-ups at Norfolk General Hospital. See R. 274-336. Two weeks after the procedure Dr. Maria Deguzman examined Brazeau and found that her cranial nerves were intact and that she was alert and oriented as to herself, city, and date. R. 335. Dr. Deguzman also noted that Brazeau had a history of cocaine and methamphetamine abuse.

4

R. 333.   She noted that Brazeau had short-term memory deficits, mild to moderate logic difficulties, and mild to moderate cognitive deficits.  R. 333.  Dr. Deguzman recommended Brazeau participate in physical, occupational, and speech therapy for her then-existing impairments.  R. 335.  Discharge notes from January 20 documented that Brazeau was alert but mildly disoriented and cited that her polysubstance abuse may have contributed to the ruptured aneurysm.  R. 470.  The discharge form also notes that she had full use of her extremities with normal sensation and that her blood pressure was well-controlled on her current medications. R. 470.  At a follow-up visit six months later Brazeau's brain appeared normal for post-aneurysm coiling.  R. 276.  During a September 2007 visit Dr. Anthony Russo found no acute intercranial abnormality and noted that Brazeau's lungs were clear with no active pulmonary disease. R. 282-84.

On October 4, 2007, after Brazeau's first disability claim, Dr. Jerry F. Foer, a clinical neuropsychologist, examined Brazeau concerning her short-term memory loss problems, fatigue and balance issues, and depression and anxiety.  R. 338.  Brazeau reported a history of crack cocaine, crystal methamphetamine, powder cocaine, and cigarette use.  R. 339.

Dr. Foer observed that Brazeau had slurred and rapid speech and spoke with a child-like tone.  R. 341.  He determined that she could comprehend instructions, that her attention and concentration was satisfactory, and that her thought processes were logical and goal directed. R. 341.  He noted that she had a deficient fund of information but that her awareness of recent news and fund of personal data was adequate.  R. 341.  Dr. Foer found that while Brazeau's intelligence was average to low average, her visual attention involving motor responses and common-sense reasoning were intact, her verbal fluency in category recall was normal, and she could either repeat or write a sentence on command.  R. 341-42.  He noted that she was limited

5

in her ability to interpret select proverbs and had balance difficulty with heal-toe walking. R. 341-42. However, he found that Brazeau was able to follow a complex (3-step) command. R. 342.

Dr. Foer also tested Brazeau's memory. He found that Brazeau's immediate memory was average, ranking in the 50th percentile. R. 342. Her immediate auditory and visual memories were average as well, ranking in the 30th and 73rd percentile respectively. R. 342. Brazeau's general memory was also average and ranked in the 70th percentile. R. 342. Her general auditory memory was average in the 50th percentile, her general visual memory was high average in the 84th percentile, and her auditory recognition was average in the 50th percentile. R. 342. Finally, Dr. Foer found Brazeau's working memory was average in the 27th percentile. R. 342.

Dr. Foer further observed that Brazeau had deficits in her fund of information, mental reversal, motor functioning, and abstract reasoning. R. 343. He noted that Brazeau reports short-term memory problems and emotional problems since suffering her brain aneurysm. R. 343. Brazeau also reported depression since childhood and recent cocaine and crystal meth abuse. R. 343. Dr. Foer gave her a Global Assessment of Function ("GAF") of 41-50[2], but found her memory to be average. R. 343-44.

Dr. Foer ultimately concluded that:

> Ms. Brazeau appears to have the cognitive capacity to perform simple and directed job duties. She also appears to be capable of performing some detailed and complex job tasks. She appears to be capable of accepting instructions from supervisors and interacting appropriately with co-workers and with the public.

---

[2] The GAF scale is a numeric scale (0 through 100) used for reporting the clinician's judgment of an individual's overall level of functioning at a specific point in time. It is rated with respect only to psychological, social, and occupational functioning. A GAF score in the 41-50 range indicates serious symptoms or any serious impairment in social, occupation, or school functioning. Diagnostic and Statistical Manual of Mental Disorders Text Revision pp. 32-4 (4th ed. 2000).

However, she may have difficulty dealing with the usual stresses encountered in competitive work. She appears to be capable of maintaining regular attendance in the work place, although her physical problems (e.g., fatigue, weakness) may interfere with her ability to perform some work activities on a consistent basis. She does not appear to require special or additional supervision. Ms. Brazeau appears to be capable of managing her own funds.

R. 343.

In January 2008, Brazeau visited Dr. Agola for a follow-up from a December MRA. R. 468. Dr. Agola noted that Brazeau was neurologically intact and stable with no complaints. R. 468. He recommended a follow-up visit in six months to assess any regrowth of the aneurysm. R. 468. After follow-up visits revealed aneurysm regrowth, R. 257, 260-62, 265-66, Brazeau underwent a successful first stage "Y" stent reconstruction in September 2008 in preparation for a follow up coil embolization of the aneurysm remnant. R. 260-61. In November 2008 she had a successful second stage "Y" stent reconstruction as well as a coil embolization on the aneurysm remnant which Dr. Agola described as "uneventful." R. 267-69.

From April 2008 to February 2010 Brazeau treated with Dr. Russo. R. 464. In April 2008 Brazeau complained of blood pressure problems and a missed period. R. 464. She conveyed that she suffered fatigue and dizziness but reported no chest pain or headaches. R. 464. Dr. Russo found Brazeau positive for fatigue, nausea, and dizziness, but negative for weakness, headaches, and blurry vision. R. 464-65. He diagnosed her with absence of menstruation, fatigue, and hypotension. R. 465. Brazeau next visited Dr. Russo in December 2008 for a refill of Coreg and Zocor. R. 462. Dr. Russo noted that she was alert and oriented, not lethargic, and had no cranial deficit. R. 463. Brazeau last visited Dr. Russo in February 2010 due to lipids and blood pressure. R. 459. Dr. Russo assessed her for hypertension and lipidemia. R. 459. He continued her on her current medications for hypertension after noting

her blood pressure was 120/80 and started her on Simvastatin for the lipidemia. R. 459. Dr. Russo also noted that Brazeau was negative for fatigue and weakness and exhibited no neurological issues. R. 460. He found her "[m]ood, memory, affect and judgment normal." R. 461.

From December 2008 to November 2009 Brazeau made three trips to the emergency room. In December 2008 Brazeau visited the emergency room at Norfolk General Hospital and was diagnosed with syncope and cocaine abuse. R. 312. She was given information on chemical dependency and cocaine abuse. R. 312-15. In 2009 Brazeau twice visited the emergency room at DePaul Medical Center for non-neurological and non-psychiatric issues. R. 403-418. On both occasions she arrived via private auto and appeared alert and oriented. R. 403-04, 412-13. During her first visit in April 2009, Brazeau denied any neurologic symptoms or deficits. R. 413. At her November 2009 visit her cranial nerves were intact, her reflexes were 2/4, strength 5/5, and her sensation was intact. R. 404.

Brazeau began seeing Dr. James Paschal as her primary care physician in 2010. R. 487. In November 2010 Dr. Paschal cited Brazeau's active problems as: hypertension; hypercholesterolemia; congestive heart failure ("CHF"); cerebral aneurysm with a stent placed; cerebrovascular accident ("CVA"); short-term memory loss; and chronic insomnia. R. 487. He noted that Brazeau's CVA was:

> associated with cerebral aneurysm and manifested by short-term memory loss, difficulty in multitasking, occasional vertigo, changes in taste and anxiety/panic attacks, disabled and unable to perform simple tasks without making significant errors, unable to maintain employment as a cashier at a gas station, as a painter painting homes or as a babysitter.

R. 487. He listed Brazeau's medications as Plavix, ASA, Coreg, Zocor, Lisinopril, and Elavil. R. 487. Dr. Paschal assessed that Brazeau's "[c]hronic medical problems appear to be under

8

good control with the present medical regimen." R. 488. He recommended she take Elavil at bedtime for her insomnia as well as for her "underlying tendency toward depression." R. 488.

Brazeau next visted Dr. Paschal in February 2011 and informed him that she was sleeping well after taking the Elavil but complained of a recent upper respiratory infection. R. 485. Dr. Paschal noted that Brazeau was pursuing disability and stated that "[s]he may need to undergo neurological and psychological evaluation to further define her disabilities." R. 485. He again concluded that her current regimen appropriately addressed her medical problems. R. 486. He recommended she continue her present medical regimen and start dietary restrictions and regular exercise to aid in weight loss. R. 486. Dr. Paschal cited the same findings and recommendations at a follow-up visit in August 2011. R. 483-84.

On September 13, 2011, Dr. Paschal conducted a Physical Residual Functional Capacity Evaluation for Brazeau. R. 493-97. Dr. Pashcal listed Brazeau's impairments as hypertension, hypercholesterolemia, CHF, CVA, short-term memory loss, depression, anxiety, and panic attacks, and her symptoms as short-term memory loss and disequilibrium. R. 493. He cited that Brazeau had no pain and no emotional factors which contributed to her symptoms and functional limitations. R. 493-94. He did note, however, that she suffered psychological conditions including depression, anxiety, and insomnia, which do affect her functional capabilities. R. 494. He also found that Brazeau's impairments had lasted or could be expected to last at least twelve months. R. 493.

Dr. Paschal also opined that Brazeau had physical limitations such that she could only sit for fifteen minutes before needing to stand, stand for thirty minutes before needing to sit, and could only walk one block before needing to rest. R. 493. He determined that Brazeau could sit less than two hours and stand at least six hours in an eight-hour workday; had to walk for at least

four minutes every fifteen minutes; needed to shift positions at will during work; and would need

to take unscheduled breaks every hour for roughly fifteen minutes. R. 495. He further found she

was capable of carrying no more than ten pounds occasionally and twenty pounds rarely; with no

climbing ladders, and rare crouching and looking up, but allowing for other postural activities

occasionally or frequently. R. 495-96.

Dr. Paschal ultimately concluded that Brazeau could not work due to her memory

problem, poor concentration, and balance problems when looking up or down. R. 496. He

found that these impairments would produce "good days" and "bad days" and would result in

Brazeau being absent from work more than four days per month. R. 496. Dr. Paschal further

found that Brazeau's memory loss would frequently interfere with the attention and

concentration needed to perform even simple work tasks. R. 494. He thus opined that Brazeau

was incapable of performing even "low stress" jobs. R. 494. He based this opinion on Brazeau's

self-report of frequent errors as a store clerk at BP in 2008. R. 494.

At the hearing, Brazeau testified that she is disabled and unable to work because of

fatigue, depression, panic attacks, and poor public relations. R. 39. She also stated that she has

difficulty concentrating, see R. 49-50, and balance issues which sometimes cause her to walk

sideways. R. 45, 51. She testified that she takes Elavil for her depression and anxiety. R. 40.

She testified that she has not received any mental health treatment, because she cannot afford it,

R. 39-40, nor has she had any psychiatric hospitalizations. R. 45. Brazeau further testified that

she stopped using crack cocaine 16 months before the hearing, before which she was using

cocaine two or three times a week. R. 43. She stated that she functioned the same whether or

not she was intoxicated. R. 44.

10

Brazeau lives with her sister. R. 36. She does little driving, R. 42, and cooking, does her own laundry, and grocery shops with her sister. R. 47. She has a daughter and three grandchildren, but stated she is not allowed to babysit her grandchildren, because she tried it once and it did not go well. R. 46-47. She indicated that for the most part, she gets along with people "okay." R. 46.

Brazeau's sister, Deborah Speed, also testified at the hearing. R. 52-57. Speed testified that Brazeau has difficulty focusing, R. 53, is easily distracted, R. 54, repeats herself in conversation, R. 54, and acts very child-like. R. 55, 56. She stated that she no longer allows Brazeau to vacuum, because on one occasion Brazeau concentrated on only one area of the carpet until the carpet burned. R. 55. Speed further testified that Brazeau sometimes struggles with her balance. R. 55-56. She stated that since her ruptured aneurysm, Brazeau is no longer independent, and Speed is not comfortable leaving her alone. R. 56-57. Speed testified, however, that Brazeau does drive short distances and attends a weekly Bingo game with her mother-in-law. R. 54-55.

In addition to Brazeau's and Speed's testimony, the ALJ heard from Linda Auggins, a vocational expert ("VE"). The VE testified based upon limitations framed by the ALJ that Brazeau could work as a dining room attendant or garment folder. R. 58. She testified that there were approximately 1,500 positions locally and 430,000 available nationally for the occupation of dining room attendant, and 2,100 positions locally and 919,000 available nationally for garment folder. R. 58. The VE also stated that no work would be available if Brazeau was not able to handle regular work stresses such as being on time and working a full eight hours. R. 58. She further testified that neither the dining room attendant, nor the garment folder, occupation

11

allows for unscheduled breaks.  R. 59.  She also noted that a GAF score between 41 and 50 is "considered a serious symptom, which would preclude work."  R. 59.

### III.    STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, the Court reviews de novo any part of a Magistrate Judge's recommendation to which a party has properly objected.  Fed. R. Civ. P. 72(b)(3).  The Court may then "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Id.

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decisions falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390.  Thus, reversing the denial of

benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. DISCUSSION

Plaintiff objects to the Magistrate Judge's Report and Recommendation on three grounds. First, Plaintiff argues that the ALJ's rejection of the Plaintiff's GAF score assessed by Dr. Foer was improper. Pl.'s Objs. 2, ECF No. 15. Second, Plaintiff argues that the ALJ erred by not giving controlling or great weight to Dr. Paschal's opinion. Id. Third, Plaintiff argues that the ALJ incorrectly evaluated and rejected the testimony of Ms. Speed. Id. For the reasons set forth in this Opinion and Order, the Court finds that the Plaintiff's arguments do not warrant remand or reversal.

### A. THE ALJ CORRECTLY CONSIDERED AND REJECTED THE GAF SCORE

Plaintiff argues that the ALJ did not properly consider the GAF score assessed by Dr. Foer in light of the ALJ's decision to afford Dr. Foer's opinion great weight. See Pl.'s Objs. 2-5, ECF No. 15. Brazeau does not challenge the determination that the opinion was entitled to the great weight but rather asserts that, in light of the weight given to the opinion, the GAF score should have been used to find that she was unable to work in light of the VE's testimony. Brazeau argues that the ALJ's failure to use the GAF score in such a manner was inconsistent and unsupported by substantial evidence. See Id.

The inconsistency, however, lies not in the ALJ's evaluation but rather in Dr. Foer's opinion. In his opinion, Dr. Foer both assessed the GAF score of 41-50 and determined that "Ms. Brazeau appears to have the cognitive capacity to perform simple and directed job duties. She also appears to be capable of performing some detailed and complex job tasks." R. 25. The

opinion, therefore, appears to support that Brazeau both is and is not capable of work.  The ALJ

noted the contrasting implications of the opinion.  R. 25.  He then weighed the evidence in light

of the entirety of the record and determined that the part of the opinion supporting Brazeau's

ability to sustain work activity was more persuasive than the lone GAF score.  R. 25-26.

A GAF score does not in and of itself suggest that a claimant is precluded from work.  "A

GAF score, standing alone, is not evidence of an impairment that seriously interferes with

Plaintiff's ability to work."  Love v. Astrue, 3:11CV14-FDW-DSC, 2011 WL 4899989, at *4

(W.D.N.C. Sept. 6, 2011) (citing Lopez v. Barnhart, 78 F. App'x 675, 678 (10th Cir. 2003)).

"The Commissioner has declined to endorse the GAF scale for 'use in the Social Security and

SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the

severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684,

692, n. 5, (11th Cir. 2005) (quoting 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)).  In this

case, the GAF score was the only part of Dr. Foer's opinion which indicated that the claimant

would be precluded from work.  R. 338-44.  The rest of the opinion, when dealing directly with

the issue of whether or not Brazeau was capable of sustaining work activity, indicated that she

was in fact capable.  See R. 338-44.

The Court rejects the Plaintiff's argument that there is no substantial evidence supporting

the ALJ's decision to afford great weight to the rest of Dr. Foer's opinion apart from the GAF

score.  The fact that the rest of Dr. Foer's opinion supported the Plaintiff's ability to work clearly

provides "more than a mere scintilla" of evidence supporting the ALJ's interpretation and

application of Dr. Foer's opinion.  Laws, 368 F.2d at 642.  The Plaintiff argues that *a* rational

conclusion of giving Dr. Foer's opinion great weight would be to subsequently accept the GAF

assessment.  Pl.'s Objs. 5, ECF No. 15.  It is debatable whether such a conclusion would be

rational, but such a debate is irrelevant to this Court's decision since a decidedly rational conclusion would be to take Dr. Foer at his written word and accept his assessment that Brazeau may "perform simple and directed job duties." (R. 25). At this point it is clear that there is some conflict in the evidence, but since the ALJ's determination is supported by such evidence as a reasonable mind might accept it will not be vacated. To do so would be to re-weigh the evidence, and this Court will not engage in such an exercise. As noted supra, the standard of review is that the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner or the Commissioner's delegate (i.e., the ALJ). Craig, 76 F.3d at 589; Hays, 907 F.2d at 1456. The Court finds that there is substantial evidence supporting the ALJ's rejection of the GAF score despite the great weight accorded to Dr. Foer's opinion.

Additionally, while the Plaintiff does not appear to object to the legal standard used in the attribution of great weight to Dr. Foer's opinion, even if she did so based on the grounds of inconsistency her argument would fail. The Plaintiff correctly notes that medical opinions that are not given controlling weight must be weighed using the six factors set forth at 20 C.F.R. § 404.1527(c). Pl.'s Objs. 5, ECF No. 15. One of the six factors is consistency of the opinion with the record as a whole. 20 C.F.R. §404.1527(c)(4). However, § 404.1527(c) only requires that each of the six factors be considered, not that every one of the six be "satisfactorily" met. In this case, the ALJ clearly considered the partial inconsistency between the opinion and the "record considered in its entirety" due to the GAF score. R. 25. That, combined with the ALJ's explicit noting that opinion evidence was considered "in accordance with 20 CFR 404.1527," R. 23, makes it clear that the ALJ did consider the § 404.1527(c) factor of consistency when determining how much weight to give Dr. Foer's opinion. The ALJ, therefore, applied the

proper legal standard as to Dr. Foer's opinion.   Again, as noted supra there is substantial evidence supporting the ALJ's rejection of the GAF score and so the Court will not engage in re-weighing whether the GAF score should have been accepted instead.

### B.   THE ALJ CORRECTLY WEIGHED DR. PASCHAL'S OPINION

Plaintiff also challenges the ALJ's decision to afford minimal weight to the opinion of Dr. Paschal, her treating physician. Pl.'s Objs. 5-7, ECF No. 15.  While it is not entirely clear from the Plaintiff's legal reasoning, it appears that Brazeau objected both to whether the proper legal standard was applied in evaluating the evidence and whether the decision was supported by substantial evidence on the record.  For the reasons set forth below, the Court finds that the ALJ applied the proper legal standard in his evaluation and that the ALJ's decision was supported by substantial evidence.

#### 1.    The ALJ Correctly Applied the Legal Standard

Brazeau asserts that the ALJ's evaluation of Dr. Paschal's opinion was contrary to the legal standard set out in the regulations and case law. Pl.'s Objs. 7, ECF No. 15.  Brazeau cites to 20 C.F.R. §§ 404.1527(d) and 416.927(d) in support of this assertion.  Id.  However, subsections (d) for each of those code sections actually discuss what issues are reserved to the Commissioner.  Presumably Plaintiff meant to cite to subsections (c), which state the six factors that the ALJ must consider in making a determination of how much weight to give an opinion.

In determining the weight to be accorded to a non-controlling medical opinion, the ALJ must consider the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c).  Those factors are: (1) whether the source of the opinion has examined the plaintiff; (2) whether the source of the opinion has a treatment relationship with the plaintiff, and the nature, extent, and length of the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) whether

the opinion is consistent with the record as a whole; (5) whether the source of the opinion is a specialist; and, (6) any other factors that support or contradict the opinion (including "the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has").

As noted supra, the ALJ explicitly stated that he considered all opinion evidence in light of 20 C.F.R. §§ 404.1527 and 416.927, which contain the same relevant six factors. R. 23. Though the ALJ failed to subsequently address all of the factors listed in 20 C.F.R. §§ 404.1527(c)(1)-(6) expressly (although he did expressly address most of them), that failure does not justify remand or overturning the decision. See Lusardi v. Astrue, 350 F. App'x 169, 172 (9th Cir. 2009) (finding that the ALJ's decision was supported by substantial evidence, notwithstanding the ALJ's failure to consider all factors, where the opinion suggests he was considering all factors and expressly addressed specialization, the nature of the treatment relationship, consistency with the record, and other relevant factors).

Here, the ALJ's opinion shows that he knew that Dr. Paschal was a treating physician and an examining source, considered the consistency of Dr. Paschal's opinion in light of the entire record, noted that the opinion was not supported by relevant evidence, and noted that Dr. Paschal was a primary care physician (as opposed to a specialist). R. 26. The only factor that was not expressly addressed was the sixth and final factor of "any other factors," such as the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R § 404.1527(c)(6). However, there is no evidence in the record that there were other factors that the ALJ should have considered, and the Plaintiff does not note any such factors in her objection. Therefore, the ALJ correctly applied the correct legal standard in determining how much weight to give to Dr. Paschal's opinion.

17

2.     The ALJ's Decision to Afford Dr. Paschal's Opinion Minimal Weight is

Supported by Substantial Evidence

Brazeau also asserts that the ALJ's determination that Dr. Paschal's opinion was only due minimal weight is not supported by substantial evidence. See Pl.'s Objs. 6-7, ECF No. 15.

In response to Dr. Paschal's opinion that Brazeau was "incapable of even low stress jobs," the ALJ found that there was "no basis in the record considered in its entirety or specifically in Dr. Paschal's record to support these extreme limitations." R. 26.  Brazeau counters that the record is "replete with factual and medical evidence that supports the limitations assessed by Dr. Paschal." Pl.'s Mem. Supp. Summ. J. 17, ECF No. 10.  While the Plaintiff proceeds to accurately state that it is undisputed that she suffers from medical problems that would support a finding of some limitations on her ability to work, that does not mean that the ALJ must therefore find that she is incapable of any work.  It is the ALJ's duty to consider the record as whole and to make a determination based on all of the evidence.

It is not the case that the ALJ determined that there was no support for "any" of the limitations in Dr. Paschal's opinion, nor did the ALJ find that Brazeau was capable of working "any" kind of job.  Rather, the ALJ determined that the "extreme" limitations, namely that Brazeau was "incapable of even low stress jobs," did not have support in the record.  R. 26.  The specific evidence of Dr. Foer's opinion was evidence in favor of that determination and directly contradicted Dr. Paschal's extreme limitations.  While it is true that Dr. Paschal's relationship of treating physician does support a determination of giving weight to his opinion over Dr. Foer's, it is not conclusive.  There are six factors to consider per 20 C.F.R. §§ 404.1527(c) and 416.927(c), and the other factors support Dr. Foer's opinion over Dr. Paschal's.

18

First, Dr. Foer was a specialist, a neuropsychologist. It is important to note that when Dr. Paschal was informed by Brazeau that she was pursuing disability benefits he included in his report that she "may need to undergo neurological and psychological evaluation to further define her disabilities." R. 485. Dr. Foer provided the very type of evaluation that Dr. Paschal suggested. Second, Dr. Paschal did not appear to use any sort of medically acceptable clinical or laboratory diagnostic techniques to determine the type and extent of Brazeau's disabilities, while Dr. Foer did do so. Third, there is evidence in the record from other treating physicians who found Brazeau's neurological symptoms to be only moderate or non-existent after her admittedly serious brain injury, providing additional support for Dr. Foer's opinion.

Plaintiff claims to find additional support for giving Dr. Paschal's opinion great weight from SSR 96-2p. Pl.'s Objs. 7, ECF No. 15. In relevant part, SSR 96-2p states that "in many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188 (July 2, 1996). Here, the treating source's medical opinion (Dr. Paschal's opinion) was found to not be entitled to controlling weight. Plaintiff argues that, pursuant to SSR 96-2p, Dr. Paschal's opinion is still entitled to "the greatest weight." Pl.'s Objs. 7, ECF No. 15. However, Plaintiff seems to confuse the phrase "in many cases" with "in all cases." There is nothing in the plain language of SSR 96-2p that dictates that a treating source's opinion is always entitled to either great or controlling weight, despite what the Plaintiff's reasoning seems to suggest. There is clearly evidence in the record that a reasonable mind would accept supporting Dr. Foer's opinion over the conflicting opinion of Dr. Paschal. As has been stated numerous times before, the Court will not engage in the re-weighing of conflicting evidence. Therefore, the Court finds that the

19

ALJ's decision to afford Dr. Foer's opinion minimal weight is supported by substantial evidence and will not be disturbed.

###    C.    THE ALJ CORRECTLY EVALUATED THE TESTIMONY OF DEBORAH SPEED

Finally, the Plaintiff asserts that the ALJ improperly evaluated the testimony of Deborah Speed, the Plaintiff's sister. Pl.'s Objs. 2, ECF No. 15. In an interesting legal strategy the Plaintiff fails to provide any further support for, or discussion of, that assertion in her objection. Even assuming that the Plaintiff wished to use the same arguments contained in her Motion for Summary Judgment, the Court finds that the ALJ correctly evaluated Speed's testimony.

Speed testified as to her personal observations of her sister. Among other things, Speed testified that Brazeau was no longer independent, and Speed was not comfortable leaving her alone. R. 56-57. This testimony lent support to Brazeau's claim that she was disabled and unable to work. However, Speed further testified that Brazeau does drive her automobile for short distances and does play Bingo, both of which require ability and awareness. R. 54-55. The ALJ rejected Speed's testimony because he found that it was not credible in light of the rest of the record. R. 24. There is ample evidence to support this determination as discussed in this opinion. In particular, the ALJ noted that Dr. Foer's report does not support Speed's testimony. R. 24. Given that there is substantial evidence that supports the ALJ's rejection of Speed's testimony, the Court will not then "make credibility determinations," Craig, 76 F.3d at 589, which would be necessary to find the ALJ's treatment of Speed testimony improper. The Court finds no error with the ALJ's rejection of Speed's testimony.

###    V.    CONCLUSION

For the reasons set forth herein, the Court finds that: (1) the ALJ correctly disregarded the GAF score assessed by Dr. Foer; (2) the ALJ correctly weighed Dr. Paschal's opinion; and

(3) the ALJ correctly evaluated the testimony of Deborah Speed.   The Court, therefore:

(1) **ACCEPTS** the Magistrate Judge's Report and Recommendations, ECF No. 14;

(2) **AFFIRMS** the decision of the Commissioner of the Social Security Administration;

(3) **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 9; and (4) **GRANTS**

Defendant's Motion for Summary Judgment, ECF No. 11.  The Clerk is **DIRECTED** to forward

a copy of this Order to all Counsel of Record.

      **IT IS SO ORDERED.**

                          Robert G. Doumar
                          Senior United States District Judge

                          UNITED STATES DISTRICT JUDGE

Norfolk, VA
August 21, 2013